**FOX GROUP LEGAL**
MYKHANH SHELTON, SBN 198606
2121 Avenue of the Stars, Suite 700
Los Angeles, CA 90067
Telephone: (310) 369-2912
Email: mykhanh.shelton@fox.com

**MITCHELL SILBERBERG & KNUPP LLP**
ADAM LEVIN, SBN 156773
SETH E. PIERCE, SBN 186576
GABRIELLA A. NOURAFCHAN, SBN 301594
11377 W. Olympic Blvd.
Los Angeles, CA 90064
Telephone: (310) 312-2000
Email: axl@msk.com
        sep@msk.com
        gan@msk.com

Attorneys for Defendant

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLLEEN DOMINGUEZ, an individual,<br><br>                    Plaintiff,<br><br>          v.<br><br>FS1 LOS ANGELES, LLC; and DOES 1 through 10, inclusive,<br><br>                    Defendants. | Case No.  2:15-cv-09683 RSWL (AJWx)<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>Judge:  Hon. Ronald S.W. Lew<br>Date:    February 23, 2016<br>Time:   10:00 a.m.<br><br>Trial Date:  None Set |

## <u>NOTICE OF MOTION AND MOTION</u>

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on February 23, 2016 at 10:00 a.m. or as soon thereafter as counsel may be heard in the Courtroom of the Hon. Ronald S.W. Lew of the United States District Court, Central District, Courtroom 21, 312 North Spring Street, Los Angeles, California 90012, Defendant FS1 Los Angeles, LLC ("Defendant") will move the Court to dismiss all claims asserted against Defendant by Plaintiff Colleen Dominguez in her Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that the claims do not state a claim upon which relief can be granted.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on January 14, 2016, and will be based on this Notice of Motion and motion, the accompanying Memorandum of Points and Authorities in support thereof, the accompanying Request for Judicial Notice, the pleadings and other files herein, and such other written and oral argument as may be presented to the Court.

DATED:  January 22, 2016      FOX GROUP LEGAL

                              By:   *MyKhanh Shelton*
                                    MyKhanh Shelton, Esq.
                                    Attorney for Defendant
                                    FS1 LOS ANGELES, LLC

DATED:  January 22, 2016      MITCHELL SILBERBERG & KNUPP LLP

                              By:   /s/Seth E. Pierce
                                    Adam Levin, Esq.
                                    Seth E. Pierce, Esq.
                                    Gabriella A. Nourafchan, Esq.
                                    Attorney for Defendant
                                    FS1 LOS ANGELES, LLC

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND KEY FACTS ...................................................... 1

II.   LEGAL STANDARDS ......................................................................... 3

    A.    GENERAL STANDARDS ........................................................... 3

    B.    CONSTITUTIONAL DEFENSES ................................................ 4

III.  FIRST AMENDMENT ........................................................................ 5

    A.    THE FIRST AMENDMENT BARS CIVIL CLAIMS THAT INTRUDE
        UPON AND REGULATE PROTECTED SPEECH ............................. 5

    B.    DEFENDANT'S SPORTS NEWS AND OTHER PROGRAMMING ARE
        FULLY PROTECTED .................................................................. 6

    C.    PLAINTIFF MAY NOT USE ANTI-DISCRIMINATION LAWS TO
        MODIFY THE CONTENT OF DEFENDANT'S PROGRAMMING OR TO
        CONVEY HER PREFERRED MESSAGE ......................................... 8

        1.    Editorial Control:  Defendant's Decisions About Which News Stories
            to Produce and Televise Are Protected By the First Amendment ............... 8

        2.    Casting Decisions:  Defendant's Decision As To Who Will Appear
            On-Air And Shape/Convey Its Message Is Likewise Protected by the
            First Amendment .................................................................. 10

        3.    Plaintiff's Invocation Of Anti-Discrimination Laws Do Nothing To
            Alter This Outcome; The First Amendment Remains Paramount ........... 13

        4.    The Result Is Also The Same Whether Plaintiff's Claims are
            Characterized As Discrimination or Retaliation. ............................ 15

IV.   THE FIFTH AMENDMENT ............................................................... 15

V.    ADDITIONAL, ALTERNATIVE ARGUMENTS ............................... 19

    A.    PLAINTIFF CANNOT STATE A CLAIM OF AGE AND GENDER
        DISCRIMINATION UNDER THE ADEA ....................................... 19

    B.    PLAINTIFF CANNOT STATE A CLAIM OF RETALIATION ............ 20

VI.   CONCLUSION .................................................................................. 21

# TABLE OF AUTHORITIES

<u>Page(s)</u>

<span style="font-variant: small-caps">Cases</span>

*AK Steel Corp. v. United Steel Workers of Am.,*
  No. C-1-00-374, 2002 WL 1624290 (S.D. Ohio Mar. 30, 2002).......................5

*Ascon Props., Inc. v. Mobil Oil Co.,*
  866 F.2d 1149 (9th Cir. 1989)....................................................................3

*Ashcroft v. Iqbal,*
  556 U.S. 662, 129 S. Ct. 1937 (2009) ...................................................3, 4

*Assocs. & Aldrich Co. v. Times Mirror Co.,*
  440 F.2d 133 (9th Cir. 1971) .......................................................................9

*Bartnicki v. Vopper,*
  532 U.S. 514, 121 S. Ct. 1753 (2001) .........................................................5

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544, 127 S. Ct. 1955 (2007) ...................................................3, 4

*Best v. Berard,*
  776 F. Supp. 2d 752 (N.D. Ill. 2011) ...........................................................6

*Brown v. Entm't Merchs. Ass'n,*
  131 S. Ct. 2729 (2011)..................................................................................6

*City of Chicago v. Morales,*
  527 U.S. 41, 119 S. Ct. 1849 (1999) .....................................................17, 18

*Claybrooks v. Am. Broad. Co.,*
  898 F. Supp. 2d 986 (M.D. Tenn. 2012) .................................................passim

*Cochran v. NYP Holdings, Inc.,*
  58 F. Supp. 2d 1113 (C.D. Cal. 1998)..........................................................4

*Connally v. General Constr. Co.,*
  269 U.S. 385, 46 S. Ct. 126 (1926) ...........................................................17

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.,*
  547 F.3d 1095 (9th Cir. 2008)......................................................................5

ii

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Eagles Nest Ranch & Academy v. Bloom Twp. Bd. of Trs*,
   No. 2:06-CV-242, 2007 WL 650485 (S.D. Ohio Feb. 26, 2007)........................5

*F.C.C. v. Fox Television Stations, Inc.*,
   132 S. Ct. 2307 (2012).................................................................3, 15, 16

*First Nat'l Bank of Boston v. Bellotti*,
   435 U.S. 765, 98 S. Ct. 1407 (1978) ....................................................14

*Franchise Realty Interstate Corp. v. San Francisco Local Joint Exec.*
   *Bd. of Culinary Workers*,
   542 F.2d 1076 (9th Cir. 1976) ..............................................................4

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
   132 S. Ct. 694 (2012)..........................................................................5

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
   515 U.S. 557, 115 S. Ct. 2338 (1995) ...........................................passim

*Ingels v. Westwood One Broad. Servs., Inc.*,
   129 Cal. App. 4th 1050, 129 Cal. Rptr. 3d 933 (2005) ...........................14

*Intri–Plex Techs. v. Crest Grp., Inc.*,
   499 F.3d 1048 (9th Cir. 2007) ..............................................................3

*Joseph Bursty, Inc. v. Wilson*,
   343 U.S. 495, 72 S. Ct. 777 (1952) ....................................................6, 7

*Kelly v. Drexel Univ.*,
   907 F. Supp. 864 (E.D. Pa. 1995).......................................................19

*Lanzetta v. State of New Jersey*,
   306 U.S. 451, 59 S. Ct. 618 (1939) .....................................................15

*Luce v. Dalton*,
   166 F.R.D. 457 (S.D. Cal. 1996),
   *aff'd*, 167 F.R.D. 88 (S.D. Cal. 1996)..................................................19

*Lyle v. Warner Bros. Television Prods.*,
   38 Cal. 4th 264, 132 P.3d 211 (2006) .................................................14

iii

**TABLE OF AUTHORITIES**
<u>(continued)</u>

<u>Page(s)</u>

*Maloney v. T3Media, Inc.,*
  94 F. Supp. 3d 1128 (C.D. Cal. 2015) ................................................. 6

*McDermott v. Ampersand Publ'g, LLC,*
  593 F.3d 950 (9th Cir. 2010) ..................................................... 9, 12

*Miami Herald Publishing Co. v. Tornillo,*
  418 U.S. 241, 94 S. Ct. 2831 (1974) ......................................... 8, 9, 17

*Miller v. Rykoff–Sexton, Inc.,*
  845 F.2d 209 (9th Cir. 1988) ....................................................... 20

*Moore v. Univ. of Notre Dame,*
  968 F. Supp. 1330 (N.D. Ind. 1997) ................................................. 6

*NAACP v. Claiborne Hardware Co.,*
  458 U.S. 886, 102 S. Ct. 3409 (1982) ............................................... 5

*Nelson v. McClatchy Newspapers, Inc.,*
  131 Wash. 2d 523, 936 P.2d 1123 (Wash. 1997) ........................... 9, 10, 14

*New York Times Co. v. Sullivan,*
  376 U.S. 254, 84 S. Ct. 710 (1964) ................................................. 5

*Passaic Daily News v. NLRB,*
  736 F.2d 1543 (D.C. Cir. 1984) .......................................... 10, 14, 15

*Reno v. Am. Civil Liberties Union,*
  521 U.S. 844, 117 S. Ct. 2329 (1997) .............................................. 16

*Schad v. Borough of Mount Ephraim,*
  452 U.S. 61, 101 S. Ct. 2176 (1981) ................................................ 6

*Sessoms v. BET Networks, Inc.,*
  Case No. BC517318, at 13 (L.A. Super. Ct., filed Apr. 17, 2014) ................... 13

*Snyder v. Phelps,*
  562 U.S. 443, 131 S. Ct. 1207 (2011) ............................................... 6

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Tamkin v. CBS Broad., Inc.*,
  193 Cal. App. 4th 133, 122 Cal. Rptr. 3d 264 (2011) ........................................7

*Trent v. Valley Elec. Ass'n, Inc.*,
  41 F.3d 524 (9th Cir. 1994) ................................................................................20

*U.S. v. Lantz*,
  No. CR-2-08-015, 2009 WL 1107708 (S.D. Ohio Apr. 22, 2009) ......................5

*U.S. v. Ocegueda*,
  564 F.2d 1363 (9th Cir. 1977) ..............................................................................5

*Univ. of Texas Southwestern Med. Ctr. v. Nassar*,
  133 S. Ct. 2517 (2013) ........................................................................................20

*Windsor v. The Tennessean*,
  719 F.2d 155 (6th Cir.1983) .................................................................................5

## STATUTES

29 U.S.C. § 623(a)(1) ...........................................................................................19

## OTHER AUTHORITIES

Federal Rules of Civil Procedure
  Rule 8(a)(2)...................................................................................................3, 4
  Rule 12.............................................................................................................20
  Rule 12(b)(6) ....................................................................................................5

# I.   <u>INTRODUCTION AND KEY FACTS</u>

Plaintiff Colleen Dominguez, by her own assertion, is a "nationally recognized sports reporter/personality," with a long and distinguished reporting career.  (Complaint, ¶ 8)  Plaintiff's job is to shape and present stories to FS1's audience.  Consistent with that role, Plaintiff's duties include pitching and developing stories, obtaining and conducting on-air interviews with notable sports figures, and on-air reporting of live sporting events and sports-related news.  (Complaint, ¶¶ 13, 16, 17)

Plaintiff alleges that Defendant's editorial decisions–which of Plaintiff's story ideas to pursue and produce, which interviews to conduct, how much time to devote to Plaintiff's ideas (versus other news, live events, and commentary), and which reporter should present/cover each story–are biased.  She claims Defendant is not basing its decisions on editorial merit, but on Plaintiff's gender and age.

Plaintiff's allegations cannot, however, be reconciled with the facts, even as alleged in Plaintiff's Complaint.  Why would Defendant actively court Plaintiff (Complaint, ¶ 12), sign her to a lucrative, high-profile contract (*id.*), and announce and promote it to the world (*id.*), only to turn around and discriminate against her on the basis of gender and age–characteristics that did not change **in the months** between her signing and the alleged events at issue?

The answer is self-evident; it would not and did not. Plaintiff's on-air appearances did decline and various story ideas were passed over–but such editorial decisions had nothing to do with Plaintiff's age or gender, and are not subject to judicial review.[1]

---

[1] Plaintiff was not the victim of discrimination.  Defendant's programming moved away from news and features to a more commentary-oriented format and while this may be frustrating to Plaintiff, it is not actionable.  Plaintiff had a "pay or play" deal that guaranteed Defendant full editorial and creative control; Defendant had no obligation to use Plaintiff's services–it was only required to pay her, which it did.

1    Defendant has a constitutional right to shape its shows, including its news

2    shows–indeed, especially its news shows–consistent with the message it wishes to

3    send.  Plaintiff's gender and age allegations are inextricably intertwined with the

4    notion that "women have no place here" and that "youth is better than

5    experience"–a point Plaintiff asserted in a public statement regarding this very

6    lawsuit:

7            In my industry, those in the executive offices seem to think they know
             exactly what and who viewers want to watch.  Many of those
8            executives are men.  At Fox Sports, they most certainly are….It's
             almost 2016 and this is the **message** networks want to send to our
9            mothers, sisters, daughters, neighbors and co-workers.  When it comes
             to women, youth is valuable and experience is disposable.  Really?
10

11

12    Dominguez Op-Ed Article, Request for Judicial Notice, Ex. 1.

13    Defendant vigorously denies that it discriminated against Plaintiff[2] but if

14    Plaintiff is correct (which must be assumed for purposes of this Motion),[3] FS1 has

15    a constitutional right to send that message or any other one–no matter how

16    abhorrent –to its audience and the right to avoid selecting speakers who will

17    conflict with that message.

18    Defendant's choice of reporter and programming choices are core speech;

19    Defendant cannot be forced to alter its message or chosen messenger.

20    Plaintiff's Complaint should be dismissed on this ground alone.

21                                    * * *

22

23

24    [2] Indeed, if it did, Plaintiff would never have been hired in the first place.

25    [3] *Claybrooks v. Am. Broad. Co.*, 898 F. Supp. 2d 986, 997 (M.D. Tenn. 2012) (race
      discrimination in casting case; regardless of the defendants' denial of wrongdoing
26    or the alleged messaging, "the court must assume…that the defendants *did*
      discriminate on the basis of race, [and] that they did so to conform the content of
27    their Shows to cater to the viewpoint of their target audience concerning interracial
      relationships….") (emphasis original).

28

1   Plaintiff's Complaint also should be dismissed because application of federal

2   anti-discrimination laws in the manner advanced would create insurmountable

3   vagueness problems that would violate the Due Process Clause of the Fifth

4   Amendment.  *See, e.g., F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307,

5   2317-20 (2012) (unanimously striking down application of FCC indecency rule, as

6   applied, on vagueness grounds).

7                                    * * *

8   Plaintiff's ADEA and retaliation claims, finally, fail to state a claim for

9   which relief can be granted.  Hybrid age/gender claims are not cognizable under

10  the ADEA, and Plaintiff alleges **no** retaliatory acts after she complained – the *sine*

11  *qua non* of any retaliation claim.

12                                   * * *

13  Plaintiff's Complaint should be dismissed.  And, where, as here, the defects

14  **cannot** be cured by amendment, the dismissal should be *with prejudice*.  *See, e.g.*,

15  *Claybrooks*, 898 F. Supp. 2d at 1000 (dismissing *with prejudice*); *Intri–Plex Techs.*

16  *v. Crest Grp., Inc.*, 499 F.3d 1048, 1056 (9th Cir. 2007); *Ascon Props., Inc. v.*

17  *Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989) ("Leave need not be granted

18  where the amendment of the complaint ... constitutes an exercise in futility ....").

19  **II.    LEGAL STANDARDS**

20  **A.    GENERAL STANDARDS**

21  "[A] complaint must contain sufficient factual matter, accepted as true, to

22  state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662,

23  678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v.  Twombly*, 550 U.S.

24  544, 570, 127 S. Ct. 1955, 1974 (2007) [hereinafter *Twombly*]) (internal quotation

25  marks omitted)).  Rule 8(a)(2) of the Federal Rules of Civil Procedure "demands

26  more than [] unadorned, the-defendant-unlawfully-harmed-me accusation[s]."  *Id.*

27  "A pleading that offers labels and conclusions or a formulaic recitation of the

28

1    elements of a cause of action will not do" and must be dismissed.  *Id.* (quoting

2    *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965) (internal quotation marks omitted).

3        The Court may consider the face of the Complaint, material integral to the

4    complaint, and judicially noticeable matters, when ruling upon a Motion to

5    Dismiss.  While the Court must generally accept all well-pleaded factual

6    allegations in the complaint as true, it is "not bound to accept as true a legal

7    conclusion couched as a factual allegation."  *Twombly*, 550 U.S. at 555, 127 S. Ct.

8    at 1965); *see also Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949.

9        A complaint that fails to allege (i) a legal claim, even where all of Plaintiffs'

10   allegations are assumed to be true, or (ii) facts sufficient to prove the asserted

11   misconduct, even if the legal claim asserted is otherwise permitted, is deficient as a

12   matter of law and should be dismissed.

13   **B.    CONSTITUTIONAL DEFENSES**

14       These principles apply with equal, if not greater, force in the context of First

15   and Fifth Amendment challenges.  Where the claim is *prima facie* protected, "more

16   specific allegations" are required, and where the allegations or undisputed facts

17   establish a Constitutional defense, early, dispositive relief is critical to prevent a

18   chilling effect on the exercise of Constitutional rights.  *See, e.g.*, *Franchise Realty*

19   *Interstate Corp. v. San Francisco Local Joint Exec. Bd. of Culinary Workers*, 542

20   F.2d 1076, 1082-83 (9th Cir. 1976) ("where a plaintiff seeks damages or injunctive

21   relief, or both, for conduct which is prima facie protected by the First Amendment,

22   the danger that the mere pendency of the action will chill the exercise of First

23   Amendment rights requires more specific allegations than would otherwise be

24   required."); *Cochran v. NYP Holdings, Inc.*, 58 F. Supp. 2d 1113, 1126 (C.D. Cal.

25   1998) (statement that was "absolutely protected by the First Amendment," could

26

27

28

1    not serve as basis for plaintiff's claim);[4] *U.S. v. Ocegueda*, 564 F.2d 1363, 1365

2    (9th Cir. 1977) (void-for-vagueness case); *U.S. v. Lantz*, No. CR-2-08-015,

3    2009 WL 1107708, at *2-3 (S.D. Ohio Apr. 22, 2009) (same).

4    **III.**    <u>**FIRST AMENDMENT**</u>

5      **A.**    **THE FIRST AMENDMENT BARS CIVIL CLAIMS THAT**

6         **INTRUDE UPON AND REGULATE PROTECTED SPEECH**

7      The First Amendment provides: "Congress shall make no law…abridging

8    the freedom of speech." U.S. Const. Amend. I. The First Amendment shields

9    protected speech and expression from private litigation as well as statutory

10    restrictions and criminal penalties. *See New York Times Co. v. Sullivan*, 376 U.S.

11    254, 277, 84 S. Ct. 710, 724 (1964) ("What a State may not constitutionally bring

12    about by means of a criminal statute is likewise beyond the reach of its civil

13    law…."); *see also Bartnicki v. Vopper*, 532 U.S. 514, 524–25, 535; 121 S. Ct.

14    1753, 1760, 1755 (2001) (holding that the federal and state wiretapping statutes

15    prohibiting publication of information, as applied to defendants, violated the First

16    Amendment); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132

17    S. Ct. 694,709-10 (2012). Thus, "[a]lthough this is a civil lawsuit between private

18    parties, the application of [anti-discrimination laws]…in a manner alleged to

19    restrict First Amendment freedoms constitutes" prohibited government action and

20    is barred. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916, n.51, 102 S. Ct.

21    3409, 3427 (1982) (applying First Amendment to state action pursuant to the

22    Fourteenth Amendment); *see also E.S.S. Entm't 2000, Inc. v. Rock Star Videos*,

---

23
24
25
26
27

[4] *See also, e.g., Windsor v. The Tennessean*, 719 F.2d 155, 162–63 (6th Cir.1983) (dismissal of plaintiff's § 1985(1) claims appropriate pursuant to Rule 12(b)(6), because, *inter alia*, defendants had "agreed to engage in constitutionally protected speech"); *Eagles Nest Ranch & Academy v. Bloom Twp. Bd. of Trs*, No. 2:06-CV-242, 2007 WL 650485, at *4 (S.D. Ohio Feb. 26, 2007) (conduct alleged "is simply not actionable" because "it is protected by the First Amendment"); *AK Steel Corp. v. United Steel Workers of Am.*, No. C-1-00-374, 2002 WL 1624290, at *6 (S.D. Ohio Mar. 30, 2002) (similar regarding statements made at union rallies; Motion to Dismiss granted)

28

1     *Inc.*, 547 F.3d 1095, 1101 (9th Cir. 2008) ("[T]he First Amendment defense

2     applies equally to [plaintiff's] state law claims as to its Lanham Act claim");

3     *Snyder v. Phelps*, 562 U.S. 443, 451, 131 S. Ct. 1207, 1215 (2011) ("[t]he Free

4     Speech Clause of the First Amendment…can serve as a defense") (citing *Hustler*

5     *Magazine, Inc. v. Falwell*, 485 U.S. 46, 50-51, 108 S. Ct. 876, 879 (1988)).

6        **B.**     **DEFENDANT'S SPORTS NEWS AND OTHER**

7              **PROGRAMMING ARE FULLY PROTECTED**

8       FS1, a cable sports network, unquestionably engages in protected speech

9     when it creates and broadcasts, *inter alia*, sports news, commentary and interviews.

10    Indeed, it is well settled that "[e]ntertainment, as well as political and ideological

11    speech, is protected" fully by the First Amendment. *Schad v. Borough of Mount*

12    *Ephraim*, 452 U.S. 61, 65, 101 S. Ct. 2176, 2181 (1981). "[M]otion pictures,

13    programs broadcast by radio and television, and live entertainment, such as

14    musical and dramatic works [all] fall within the First Amendment guarantee." *Id.*;

15    *see also Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2733 (2011) ("[V]ideo

16    games qualify for First Amendment protection."); *Joseph Bursty, Inc. v. Wilson*,

17    343 U.S. 495, 502, 72 S. Ct. 777, 781 (1952) ("[M]otion pictures … [are] included

18    within the free speech and free press guaranty of the First and Fourteenth

19    Amendments"); *Best v. Berard*, 776 F. Supp. 2d 752, 758 (N.D. Ill. 2011) ("The

20    status of *Female Forces* ["an unscripted 'reality' television series"] as an

21    entertainment program, as opposed to a pure news broadcast, does not alter the

22    First Amendment analysis.").

23       This is no less so where the subject is sports – a national passion. *See, e.g.*,

24    *Maloney v. T3Media, Inc.*, 94 F. Supp. 3d 1128, 1134-35 (C.D. Cal. 2015) (sports

25    photography); *Moore v. Univ. of Notre Dame*, 968 F. Supp. 1330, 1336 n.11 (N.D.

26    Ind. 1997) ("Given the growing number of television sports channels and the

27    number of publications relating specifically to sports, this court cannot ignore the

28

fact that this is a matter of public concern."). Today, athletes are role models and celebrities; their triumphs, affairs and indiscretions the subject of endless debate and public scrutiny. Indeed, entire channels are devoted to sports or even a single sport. The choice as to which sport and athlete to feature, what story to tell, who should tell it and how, all fall squarely within the zone of editorial judgment – identical in all respects to those made by newspaper editors and publishers covering politics or any other topic. And in this day and age, where news and entertainment are often indistinguishable, such decisions move from the editorial to the artistic, itself a well-established zone of constitutional protection. *See* cases cited *supra*.

That Defendant profits from the production and broadcast of this programming does not affect the analysis, as media content "published and sold for profit" is still "expression whose liberty is safeguarded by the First Amendment." *Burstyn*, 343 U.S. at 501, 72 S. Ct. at 780.

Defendant's programming–including reporter assignments and content decisions at the core of that process–are an exercise of Defendant's artistic and editorial vision and free speech rights. *See, e.g.*, *Tamkin v. CBS Broad., Inc.*, 193 Cal. App. 4th 133, 143, 122 Cal. Rptr. 3d 264, 271 (2011) ("the creation, casting, and broadcasting of an episode of a popular television show" is "an exercise of free speech"). Indeed, in news/interview segments, like the programming at issue, reporter assignments and editorial control are especially critical, as the reporter crafts the message/story with the questions she asks (or fails to ask) and the manner, tone and flow in which they are presented.

Walter Cronkite, Connie Chung, Dan Rather, Barbara Walters, Bryant Gumbel, Diane Sawyer, Steven Colbert, and Colleen Dominguez–to name but a few–are all storied interviewers, but each is/was unique. No one would contend they are interchangeable, or irrelevant to crafting the "story" they present.

## C. PLAINTIFF MAY NOT USE ANTI-DISCRIMINATION LAWS TO MODIFY THE CONTENT OF DEFENDANT'S PROGRAMMING OR TO CONVEY HER PREFERRED MESSAGE

Plaintiff's discrimination claim fails under the First Amendment in two related, but distinct respects–editorial control and on-air reporter selection (i.e., casting decisions). Either element is sufficient to invoke and perfect the defense; but together, they leave no doubt Plaintiff's claims are barred.

### 1. Editorial Control: Defendant's Decisions About Which News Stories to Produce and Televise Are Protected By the First Amendment

Plaintiff's Complaint is very clear. Plaintiff alleges she "worked hard to create interviews/stories that would be of interest" to Defendant, but her interview ideas and stories were not selected because of her age and gender. (Complaint ¶¶ 13, 17). At bottom, Plaintiff seeks an order compelling Defendant to use its resources and media platform to produce and broadcast the stories and interviews Plaintiff wants to be heard–or to pay her damages if it fails to do so. But this position cannot be squared with the legion of cases recognizing and protecting editorial freedom.

In *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S. Ct. 2831 (1974), a political candidate brought suit against the newspaper defendant pursuant to the state's "right-to-reply" statute after the newspaper refused to print the candidate's reply to editorials critical of him. The statute in question required newspapers to provide equal space to political candidates to reply to any criticism of the candidates' personal character or official record printed by the newspaper. Finding the statute was an unconstitutional violation of the First Amendment right to a free press the U.S. Supreme Court wrote in its seminal decision:

> The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment.  It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press…

*Id.* at 258, 94 S. Ct. at 2840; *see also Assocs. & Aldrich Co. v. Times Mirror Co.,* 440 F.2d 133, 136 (9th Cir. 1971) (holding private newspapers cannot be compelled to publish advertisements).

In *McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 959 (9th Cir. 2010), the Ninth Circuit faced with similar issues, in the context of reviewing an application for an order compelling the re-hiring of newspaper editors, reached the same conclusion:  "It is clear that the First Amendment erects a barrier against government interference with a newspaper's exercise of editorial control over its content."  *Id.* at 962 ("To the extent the publisher's choice of writers affects the expressive content of its newspaper, the First Amendment protects that choice.").

In *Nelson v. McClatchy Newspapers, Inc.*, the Washington Supreme Court addressed nearly the identical issue, when the newspaper defendant transferred Nelson, a reporter, to a behind-the-scenes "desk job" in response to her political activism.  Although the Court found that the defendant's conduct violated Washington's "Fair Campaign Practices Act," which barred discrimination on account of an employee's political activities, the Court found that the statute, as applied, ran afoul of the First Amendment:

> At the heart of [Supreme Court precedent] is the notion that in order to uphold the circulation of ideas the editors of a newspaper must be free to exercise editorial control and discretion….[L]iberty of the press is in peril as soon as the government tries to compel what is to go into a newspaper….[B]ecause the state law deprived the paper of its editorial discretion, it was necessarily unconstitutional as applied to the newspaper.

1   *Nelson v. McClatchy Newspapers, Inc.*, 131 Wash. 2d 523, 539, 936 P.2d 1123,

2   1131 (Wash. 1997) (internal citations and quotation omitted) (en banc).

3        Defendant's decision whether to create and/or televise a piece about

4   Madison Bumgarner, Rory McElroy or any other person is an exercise of editorial

5   control and judgment that is constitutionally protected.  *See Passaic Daily News v.*

6   *NLRB*, 736 F.2d 1543, 1556-59 (D.C. Cir. 1984) (reiterating "the press's freedom

7   and liberty 'to publish the news as it desires'" free of interference from labor laws,

8   such as the NLRA, which must "yield to the First Amendment.") (citation

9   omitted).

10       Defendant's decisions regarding which of Plaintiff's stories/interviews to

11  produce and televise cannot be dictated or second-guessed.  FS1 has an "absolute

12  right" to control its message.

13       **2.**    **Casting Decisions:  Defendant's Decision As To Who Will**

14            **Appear On-Air And Shape/Convey Its Message Is Likewise**

15            **Protected by the First Amendment**

16       Plaintiff's "on-air" role for FS1 reinforces this conclusion.  Plaintiff does

17  more than craft the stories (although that is enough to invoke the First

18  Amendment), she is the face of FS1–or one of them.  But Defendant has a

19  constitutional right to select its messengers, free of any governmental interference,

20  including claims of discrimination.

21       This is true in general, but particularly apt here, where the story and

22  storyteller are inseparable–each making an undefined and indefinable, contribution

23  to the final overall message.  Persona (e.g., hard edged; combative; engaging;

24  friendly), presence (e.g., stoic; steady; excited; matter of fact), and delivery (e.g.,

25  staccato, slow), to cite just a few examples shape any interview or news story.

26       Howard Cosell and John Madden were both famous sports personalities –

27  fan favorites and masters of their craft.  But no one would mistake one for the

28

1   other, or claim they are fungible.  Whether a network wants Cosell or Madden, or

2   any of the limitless variations in between or beyond, is a function of judgment and

3   artistic vision; it cannot be compelled or dictated by the Legislature, the Courts, or

4   Plaintiff.  The producer's choice of talent is fully protected.

5       The U.S. Supreme Court's seminal decision in *Hurley v. Irish-Am. Gay,*

6   *Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 559, 115 S. Ct. 2338, 2341

7   (1995), speaks directly to this issue.  Although decided in the context of parades,

8   the Supreme Court unequivocally held that speakers–be they parade organizers,

9   newspapers, or television producers/networks–have a fundamental right to control

10  their message.

11      In *Hurley*, the plaintiff was an organization known as "GLIB," which

12  consisted of openly gay, lesbian and bisexual individuals of Irish heritage.  *Id.* at

13  561, 115 S. Ct. at 2341.  GLIB sued the organizers of the St. Patrick's Day parade

14  in Boston under a Massachusetts public accommodations law to force the

15  defendant to allow GLIB to march in the parade under its own banner.  *Id.*  In a

16  **unanimous** decision, the Supreme Court held that the Massachusetts anti-

17  discrimination law could not be used to force the organizers to grant GLIB a

18  permit, as that would infringe on the organizers' right to free speech.  *Id.* at 581,

19  115 S. Ct. at 2351.

20      The Court explained that "the fundamental rule of protection under the First

21  Amendment [is] that a speaker has the autonomy to choose the content of his own

22  message."  *Id*. at 573, 115 S. Ct. at 2347.  "Since *all* speech inherently involves

23  choices of what to say and what to leave unsaid, one important manifestation of the

24  principle of free speech is that one who chooses to speak may also decide what not

25  to say." *Id.* (citations omitted) (quoting *Pacific Gas & Elec. Co. v. Public Utilities*

26  *Comm'n of Cal.*, 475 U.S. 1, 11, 16, 106 S. Ct. 903, 909, 912 (1986)) (internal

27  quotation marks omitted).

28

This First Amendment right to determine "what not to say" belongs not only to the press, but also to "business corporations" and "ordinary people," *id*. at 574, 115 S. Ct. at 2347, and, simply put, prohibits the government from forcing a defendant to communicate a plaintiff's message:

> [W]hatever the reason [for excluding GLIB from the parade], it boils down to the choice of a speaker not to propound a particular point of view, and that choice is presumed to lie beyond the government's power to control.

*Id*. at 575, 115 S. Ct. at 2348.

While the application of these fundamental principles to television casting (and other on-air decisions) is relatively new, the courts addressing the issue have uniformly concluded that casting decisions are protected for the same reason.

In *Claybrooks*, for example, two African American men filed suit against the producers of *The Bachelor* and *The Bachelorette* (popular reality TV series), under federal anti-discrimination laws, after they applied to be on the shows, but were rejected – allegedly due to their race. *Claybrooks*, 898 F. Supp. 2d at 989.

The District Court rejected their claims (on a Motion to Dismiss), holding that "casting decisions are part and parcel of the creative process behind a television program . . . thereby meriting First Amendment protection against the application of anti-discrimination statutes to that process." *Id*. at 993.

The District Court's reasoning is undeniable, and equally applicable here:

> Ultimately, whatever messages *The Bachelor* and *The Bachelorette* communicate or are intended to communicate—whether explicitly, implicitly, intentionally, or otherwise—the First Amendment protects the right of the producers of these Shows to craft and control those messages, based on whatever considerations the producers wish to take into account.

*Id*. at 1000 (citing *Hurley*, 515 U.S. at 573, 115 S. Ct. at 2347 ("A speaker has the autonomy to choose the content of his own message.") and *McDermott*, 593 F.3d

1   at 962 ("To the extent the publisher's choice of writers affects the expressive

2   content of its newspaper, the First Amendment protects that choice.")).

3        In *Sessoms v. BET Networks, Inc.*, Case No. BC517318, at 13 (L.A. Super.

4   Ct., filed Apr. 17, 2014) (unpublished trial court order),[5] the court granted an anti-

5   SLAPP motion on the grounds that a television broadcaster was entitled to a First

6   Amendment defense against discrimination claims.  In that case, a transgender

7   fashion correspondent alleged he was unlawfully forced to wear traditional men's

8   clothing on-air, rather than the androgynous style he preferred.  *Id.* at 2.  In

9   dismissing *Sessoms'* discrimination claims, the court held that, "[l]ike the parade

10  organizers in Hurley, [BET producers] chose to shape the message that emerged

11  from their events."  *Id.* at 16.  These creative decisions included the "certain style

12  and dress" of their on-air correspondents, and "fall within [BET's] First

13  Amendment right to expressive activity."  *Id.*

14       Defendant's decisions regarding who will appear on air–i.e., who will shape

15  and convey its message, and in what way given the unique qualities inherent to

16  each speaker–are a creative choice protected by the First Amendment.

17          **3.**    <u>**Plaintiff's Invocation Of Anti-Discrimination Laws Do**</u>

18               <u>**Nothing To Alter This Outcome; The First Amendment**</u>

19               <u>**Remains Paramount**</u>

20       Plaintiff's invocation of the ADEA and Title VII does nothing to alter this

21  conclusion.  Even laws that advance important and worthwhile social policy

22  objectives, like anti-discrimination laws, may not be used to regulate the content of

23  protected speech:

24          • *Hurley* and *Sessoms* were sexual orientation discrimination cases.

25          • *Claybrooks* was a race discrimination case.

26

27  [5] *See* Appendix of Foreign Authority in Support of Defendant's Motion to Dismiss, at 1.

28

1        • *Nelson* was a political action discrimination case.

2        • *Passaic* was a union discrimination case.

3        The social value of anti-discrimination laws is undisputed. But such laws

4    cannot supersede FS1's First Amendment right to control the content of its

5    message:

6              While the law is free to promote all sorts of conduct in place of
               harmful behavior, it is not free to interfere with speech for no better
7              reason than promoting an approved message or discouraging a
8              disfavored one, however enlightened either purpose may strike the
               government.
9

10   *Hurley*, 515 U.S. at 579, 115 S. Ct. at 2350.

11       As in *Hurley*, Plaintiff here wishes to use Defendant's speech to send her

12   preferred message–one that, in Plaintiff's view, is better suited to empowering

13   women, particularly older women. Notwithstanding the undisputed positive goal of

14   empowering older women, the First Amendment prohibits Plaintiff from using this

15   lawsuit to force Defendant to deliver that message.[6] *See also First Nat'l Bank of*

16   _____

17   [6] Similarly, in *Ingels v. Westwood One Broad. Servs., Inc.*, 129 Cal. App. 4th 1050, 129 Cal. Rptr. 3d 933 (2005), the plaintiff, allegedly in his 60s, sought to express
18   his views on a radio call-in show geared toward a younger audience demographic. The plaintiff was told by a screener that he was too old to be permitted on-air. *Id.* at 1056, 129 Cal. Rptr. 3d at 936. Although the plaintiff was ultimately allowed to
19   speak on-air, his call was abruptly terminated following a barrage by the host, in keeping with the show's politically incorrect style. *Id.* at 1058, 129 Cal. Rptr. 3d
20   at 937. The host explained (on-air) that the show targeted a young male demographic, which allowed it to sell more advertising time, and that because they
21   were not trying to appeal to older people, the plaintiff did not belong on their broadcast. *Id.* at 1057–58, 129 Cal. Rptr. 3d at 936. The plaintiff was never able to
22   discuss the topic about which he had originally called. *Id.* at 1056-58, 129 Cal. Rptr. 3d at 936-37.

23       In denying the plaintiff's claims for age discrimination, the California Court
24   of Appeal held that the defendants had "a First Amendment right to control the content of their program…." *Id.* at 1074, 129 Cal. Rptr. 3d at 948; *see also, e.g.,*
25   *Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 264, 297, 132 P.3d 211, 233 (2006) (Chin, J., concurring) ("When, as here, the workplace product is the
26   creative expression itself, free speech rights are paramount….Lawsuits like this one, directed at restricting the creative process in a workplace *whose very business*
27   *is speech related,* present a clear and present danger to fundamental free speech rights.") (emphasis in original).

28

1  *Boston v. Bellotti*, 435 U.S. 765, 784–85, 98 S. Ct. 1407, 1420 (1978) ("the

2  [L]egislature is constitutionally disqualified from dictating...the speaker who may

3  address a public issue.")

> ### 4.   The Result Is Also The Same Whether Plaintiff's Claims are Characterized As Discrimination or Retaliation.

6  The result is the same whether Plaintiff's claim is labeled discrimination or

7  retaliation.  In either situation, Plaintiff is trying to use anti-discrimination and

8  retaliation laws to exercise editorial control and alter the content of FS1's message

9  –a result completely at odds with the cited precedents.  *See, e.g., Passaic*, 736 F.2d

10  at 1556-57 (finding that the defendant retaliated against the plaintiff reporter/

11  columnist for engaging in union activities, but reversing order compelling the

12  defendant to begin re-printing the plaintiff's column; "the Board's order…seeks to

13  compel the Company to publish what it prefers to withhold; and…injects the Board

14  into the editorial decision-making process on an ongoing basis" neither of which

15  can be squared with the First Amendment).

16  ## IV.   THE FIFTH AMENDMENT

17  "A fundamental principle in our legal system is that laws which regulate

18  persons or entities must give fair notice of conduct that is forbidden or required."

19  *F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012); *see also*

20  *Lanzetta v. State of New Jersey*, 306 U.S. 451, 453, 59 S. Ct. 618, 619 (1939)

21  (people living under a rule of law "are entitled to be informed as to what the State

22  commands or forbids.")  This essential due process "requirement of clarity in

23  regulation," as the Supreme Court recently explained, "requires the invalidation of

24  laws that are impermissibly vague." *Fox*, 132 S. Ct. at 2317.

25  > Even when speech is not at issue, the void for vagueness doctrine
26  > addresses at least two connected but discrete due process concerns:
27  > first, that regulated parties should know what is required of them so
   > they may act accordingly; second, precision and guidance are
28  > necessary so that those enforcing the law do not act in an arbitrary or

1   discriminatory way. When speech is involved, rigorous adherence to
2   those requirements is necessary to ensure that ambiguity does not chill
3   protected speech.

4   *Id.* (citation omitted); *see also Reno v. Am. Civil Liberties Union*, 521 U.S. 844,

5   871-72, 117 S. Ct. 2329, 2344 (1997) ("The vagueness of [a content-based

6   regulation of speech] raises special First Amendment concerns because of its

7   obvious chilling effect on free speech."). Plaintiff's claims fail for this additional,

8   independent reason as well.

9         Plaintiff requests an unprecedented application of Title VII and the ADEA

10   that affords Defendant and others no notice whatsoever as to what federal anti-

11   discrimination laws prohibit or mandate when selecting news pieces to produce or

12   assigning reporters. It is unclear whether, when, and to what extent editorial

13   decisions by any show or network that targets a specific audience or demographic

14   could be considered unlawful, or whether any decision that takes into account

15   gender or any immutable characteristic of an on-air personality could subject a

16   television producer or network to civil liability. This lack of concrete standards,

17   known in advance, for the imposition of civil liability for allegedly discriminatory

18   decisions violates the void-for-vagueness doctrine because it deprives content

19   creators like Defendant of fair notice of what is, and is not, prohibited in the

20   context of making decisions integral to the messages those creators intend to

21   convey, while depriving courts of the guidance required to ensure equal and fair

22   application of the law. *See Fox*, 132 S. Ct. at 2317 ("a regulation is not vague

23   because it may at times be difficult to prove an incriminating fact but rather

24   because it is unclear as to what fact must be proved").

25         Such uncertainty will undoubtedly compel Defendant, and others like it,

26   either to alter its ultimate editorial decisions or televise certain pieces instead of

27   others to avoid litigation or potential liability for purported discrimination. Put

28   simply, faced with the potential of liability for its editorial choices, FS1 "might

16

1    well conclude" that "the safe course is to avoid controversy"—a result wholly

2    antithetical to the First Amendment's purpose of fostering free speech and

3    expression. *Tornillo*, 418 U.S. at 257, 94 S. Ct. at 2839.

4            Plaintiff's requested application of federal anti-discrimination law to the

5    selection of reporters for assignments and/or pieces to produce is so "vague and

6    standardless that it leaves [Defendant] uncertain as to the conduct it prohibits,"

7    and, accordingly, cannot pass constitutional muster. *City of Chicago v. Morales*,

8    527 U.S. 41, 56, 119 S. Ct. 1849, 1859 (1999) (citations omitted); *see also*

9    *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 127 (1926) ("a

10   statute which either forbids or requires the doing of an act in terms so vague that

11   men of common intelligence must necessarily guess at its meaning and differ as to

12   its application violates the first essential of due process of law").

13           A few examples illustrate the point:

14      •  Defendant wants to interview a well-known athlete accused of spousal

15         abuse, from a woman's perspective.  Is that allowed, or would the

16         decision to assign a female reporter constitute gender discrimination?

17      •  Defendant wants to do a story on the breakthroughs of female athletes

18         and coaches in the past year and the impact on the next generation of

19         female athletes from a peer perspective.  Would that subject

20         Defendant to liability for age and gender discrimination?

21      •  Defendant wants to interview an athlete "accused" of partying too

22         much at the expense of his teammates.  Defendant wants a young

23         reporter, just out of college, to cover the story, so he or she can play

24         up the transition from college to adulthood from a millennial's

25         perspective?  Is that age discrimination or integral to the story?

26      •  Defendant wants to interview an openly gay NFL player and wants a

27         "grit iron" former NFL player to conduct the interview–to better

28

1  contrast the change in times.  Would it be liable for gender or sexual

2  orientation discrimination–or both?

3      Producers are clearly entitled to produce and cast their programs–their

4  speech–consistent with the message they wish to send.  Any attempt to second-

5  guess these decisions will inevitably "chill otherwise protected speech" and

6  "embroil courts in questioning the creative process behind any television program

7  or other dramatic work," or interview or news article:

8         How would a court determine the point at which a television program,
          movie, or play is sufficiently 'identity-themed,' 'specifically geared'
9         to, or 'about' a particular racial, religious, or gender group to construe
          the demographics of its cast as to constitute the show's 'content'?
10        How would one even define what the creative 'content' of a program
          is?  These are intractable issues that, in light of the First Amendment,
11        are plainly beyond the appropriate scope of a court to address.
12        Indeed, as the Court pointed out in *Hurley*, an expressive work need
          not have any particularized message to justify First Amendment
13        protection, [citation omitted], and, of course, expressive works can
          mean different things to different people.
14

15

16  *Claybrooks*, 898 F. Supp. 2d at 998 (discussing issue in context of First

17  Amendment, but more relevant to Fifth Amendment defense).

18      Plaintiff invites this Court to divine the reasoning behind each and every one

19  of Defendant's editorial and assignment decisions to determine the interplay, if

20  any, between the piece and the network's editorial vision and the reporter and the

21  producer's vision for the piece.  But that kind of oversight cannot be squared with

22  the Fifth Amendment.  The analysis is inherently subjective, "vague and

23  standardless" and would leave Defendant, and other producers, "uncertain as to the

24  conduct it prohibits."  *City of Chicago,* 527 U.S. at 56, 119 S. Ct. at 1859.

25      Plaintiff's Complaint, in its entirety, fails for this additional reason.

26

27

28

1  **V.  ADDITIONAL, ALTERNATIVE ARGUMENTS**

2  Plaintiff's Complaint suffers from non-Constitutional defects as well.[7]

3  **A.  PLAINTIFF CANNOT STATE A CLAIM OF AGE AND**

4  **GENDER DISCRIMINATION UNDER THE ADEA**

5  Plaintiff **cannot** state an "age-plus" gender claim under the ADEA.

6  A plaintiff asserting an ADEA claim must allege that the employer

7  discriminated against an individual in the terms and conditions of employment

8  "because of such individual's age."  29 U.S.C. § 623(a)(1).

9  Plaintiff, here, however alleges something slightly (but significantly)

10  different–that she was discriminated against not because she is a woman, or over

11  40, but because she is an over 40 woman, so called "age-plus" discrimination.

12  (Plaintiff, by contrast, concedes that FS1 does not discriminate against younger

13  women or older men.  Complaint, ¶¶ 20, 21.)  This is a critical distinction, as courts

14  have rejected "age-plus" ADEA claims–even while simultaneously recognizing

15  them under other statutory schemes, such as Title VII.

16  In *Kelly v. Drexel Univ.*, 907 F. Supp. 864, 875 fn. 8 (E.D. Pa. 1995) for

17  example, the District Court found "no authority to recognize an 'age-plus-

18  disability' discrimination claim under the ADEA."  While the District Court

19  recognized that "plus" theories of liability were actionable under Title VII, it was

20  unwilling to import "sex-plus" theories into a completely different statutory

21  scheme, such as the ADEA.  *Id.*

22  In *Luce v. Dalton*, 166 F.R.D. 457, 461 (S.D. Cal. 1996), *aff'd*, 167 F.R.D.

23  88 (S.D. Cal. 1996), the District Court reached the same conclusion in the context

24  of a Motion for Leave to Amend.  The District Court denied the Motion, finding

25
26
27

---

[7] Defendant's First and Fifth Amendment defenses are dispositive of all of Plaintiff's causes of action and, thus, should be resolved first in the interests of judicial and party economy.  However, should the Court disagree with Defendant's Constitutional defenses, these alternative arguments are offered as to specific defects in Plaintiff's Complaint.

28

1   that as there were no set of facts under which the former employee could state a

2   claim for age-plus-religion or age-plus-disability discrimination under the ADEA,

3   amendment would be futile.[8]

4       Plaintiff's age-plus gender claim is not actionable under the ADEA.

5       **B.    PLAINTIFF CANNOT STATE A CLAIM OF RETALIATION**

6       Plaintiff has not stated a retaliation claim.

7       Plaintiff must allege "(1) that she was engaging in a protected activity,

8   (2) that she suffered an adverse employment decision, and (3) that there was a

9   causal link between her activity and the employment decision." *Trent v. Valley*

10  *Elec. Ass'n, Inc.*, 41 F.3d 524, 526 (9th Cir. 1994) (citing *EEOC v. Hacienda*

11  *Hotel*, 881 F.2d 1504, 1513–14 (9th Cir. 1989)).  The Supreme Court, moreover,

12  has clarified that to plead a cause of action for retaliation, the plaintiff must allege

13  that retaliation was the "but for" cause of the employer's adverse action.  *Univ. of*

14  *Texas Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013) ("Title VII

15  retaliation claims require proof that the desire to retaliate was the but-for cause of

16  the challenged employment action.").

17      Here, however, Plaintiff's allegations are inconsistent with the "but for"

18  causation required, as Plaintiff fails to identify any adverse employment actions

19  post-dating her complaint–her protected act–on August 3, 2015.  (Complaint, ¶ 23.)

20  While Plaintiff alleges multiple incidents prior to complaining, she alleges none

21  after and the timing is critical to a retaliation claim.

22      The Complaint lacks any facts or allegations of adverse employment actions

23  occurring after the August 3, 2015 complaint, rendering Plaintiff's retaliation cause

24  of action deficient as a matter of law.  (Complaint, ¶ 16 (last assignment in 2014

25  was in November); Complaint, ¶ 20 (only 3-4 assignments in 2015)).

26

27  [8] The standard for determining futility and legal sufficiency under Rule 12 are one and the same. *Miller v. Rykoff–Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988).

28

1    **VI.**   **<u>CONCLUSION</u>**

2         For the foregoing reasons, Defendant respectfully requests that the Court

3    dismiss the Complaint with prejudice.

4    DATED:  January 22, 2016     FOX GROUP LEGAL

5
                         By:   <u>*MyKhanh Shelton*</u>

6                                  MyKhanh Shelton, Esq.

7                                  Attorney for Defendant
                              FS1 LOS ANGELES, LLC

8

9    DATED:  January 22, 2016     MITCHELL SILBERBERG & KNUPP LLP

10                            By:   <u>/s/Seth E. Pierce</u>

11                                 Adam Levin, Esq.
                              Seth E. Pierce, Esq.

12                                 Gabriella A. Nourafchan, Esq.
                              Attorney for Defendant

13                                 FS1 LOS ANGELES, LLC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28